# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AL MAHA TRADING & CONTRACTING HOLDING COMPANY, a Saudi Arabian limited liability company, | ) ) ) ) | Case No. 1:12-CV-01920 |
| Plaintiff, | ) ) | Hon. James F. Holderman United States District Court Judge |
| v. | ) ) | |
| W.S. DARLEY & CO., an Illinois corporation, PETER DARLEY, and PAUL DARLEY, | ) ) ) | |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

Plaintiff Al Maha Trading & Contracting Holding Company ("Al Maha"), a Saudi Arabian limited liability company, by its undersigned attorney, for its Amended Complaint against W.S. Darley & Co. ("Darley"), an Illinois limited liability company, Peter Darley ("Peter Darley") and Paul Darley ("Paul Darley") (collectively, "Defendants"), states as follows:

### Introduction

1.     Darley, with the authorization and consent of Peter Darley and Paul Darley, two of its top officers, bribed Al Maha's American expatriate Fire Chief and a company officer with arrangements to pay them kickbacks of more than $470,000. The bribes influenced the Fire Chief to secure Al Maha's purchase of six fire trucks and equipment from Darley in Illinois for use in Saudi Arabia. The bribes caused Al Maha's employees/agents to abandon objective judgment and set aside the standards of skill and professionalism required of them and instead to do or to say anything to ensure that the purchase from Darley would be completed so they could collect their kickbacks. The agents left Al Maha shortly after the sale was completed and they had received over $400,000 in kickbacks. Al Maha was left with six fire trucks that were substantially

overpriced and, worse, could not be used because they required a type of diesel fuel that was unavailable in Saudi Arabia.

2.     Further, Darley, as part of the bribery-kickback scheme, with the authorization and consent of Peter Darley and Paul Darley, submitted substitute fraudulent invoices to Al Maha with hidden premiums to cover the cost of the bribe payments to Al Maha's own employees without disclosing the payments to Al Maha.

3.     Darley's fraudulent invoicing to conceal bribes and the bribes and kickbacks themselves, undertaken with the authorization and consent of Peter Darley and Paul Darley, polluted the entire sale and gives rise to the claims of fraud, conspiracy, and inducement of breach of fiduciary duty stated here. Al Maha also asserts other claims against Darley, including breach of the implied warranty of fitness for a particular purpose.

### Parties and Jurisdiction

4.     Al Maha is a limited liability company organized under the laws of the Kingdom of Saudi Arabia. Under Saudi Arabian law, Al Maha became the successor in interest to all rights and liabilities of Al Maha Trading & Contracting Establishment when said Establishment was converted to a limited liability company. Al Maha has its principal place of business in Al Khobar, Saudi Arabia.

5.     On information and belief, Darley is incorporated under the laws of the State of Illinois and has its principal place of business in Itasca, Illinois and is thus a citizen of Illinois.

6.     On information and belief, Peter Darley is a citizen of the State of Illinois, the Executive Vice President, Chief Operating Officer of Darley, and is officed in Itasca, Illinois.

7.     On information and belief, Paul Darley is a citizen of the State of Illinois, the President and Chief Executive Officer of Darley, and is officed in Itasca, Illinois.

8. The Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State, *i.e.,* Darley, Peter Darley and Paul Darley, on the one hand, and a citizen or subject of a foreign state, *i.e.,* Al Maha, on the other hand.

9. Venue for this action is proper in this judicial district pursuant to 28 U.S.C. §1391(a)(1) and (2), because (1) at least defendant Darley resides in this judicial district and all defendants are residents of Illinois; and (2) a substantial part of the events or omissions giving rise to Al Maha's claims occurred in this judicial district.

## Facts

10. Since around 1982, Al Maha has been in the business of providing manpower services in the fields of Fire and Rescue to customers exclusively in Saudi Arabia, principally in the fields of marine, aviation and industrial activities. Manpower services means the provision of staff and qualified personnel to companies needing such services for their Fire and Rescue facilities. "Fire and Rescue" is broader than fire protection; rescue includes dealing with the consequences of a fire. Al Maha's main clients are the General Authority for Civil Aviation ("GACA") in Saudi Arabia and the Port Authorities of Saudi Arabia. Al Maha is part of the Gulf Business Network ("GBN"), a group of companies with common ownership.

11. Al Maha is not a manufacturer, producer, distributor or retailer of fire services related apparatus, *e.g.*, fire trucks, or of equipment. Prior to the transaction that is the subject of this litigation, over the last 15 to 20 years, Al Maha had purchased only one fire truck, for GACA, to be used at the King Fahad Airport. The truck was purchased through a manufacturer's representative in Saudi Arabia about six or seven years ago.

12. At all relevant times, Darley marketed itself as a family owned and operated

manufacturer and international seller of firefighting apparatus (fire trucks) and equipment with nearly a century of experience and exemplifying a standard of commercial and business integrity upon which its customers could rely without question. As an experienced seller of firefighting apparatus and equipment, Darley knows or should know that apparatus and equipment needs to be of unquestioned fitness for that purpose in the emergency theaters of operation in which it is deployed. Darley has a number of competitors in the fire truck market, including KME, Pierce, Rosenbauer, E-One, Ferrara and Freightliner.

13. In 2007, EPA emissions standards for diesel engines brought about major changes in the diesel engine and diesel fuel markets in the United States. The 2007 EPA standards mandated a reduction in sulfur content in diesel fuel from 500 parts per million ("ppm") ("Low Sulfur Diesel" or "LSD") to 15 ppm ("Ultra Low Sulfur Diesel" or "ULSD"). U.S. engine manufacturers extensively redesigned diesel engines to run on ULSD and meet 2007 EPA emissions standards. U.S. oil refiners and distributers revamped to provide ULSD in the U.S. domestic market.

14. The rest of the world (other than Canada), and including Saudi Arabia, continued to use LSD.

15. The 2007 EPA regulations relating to diesel engines were widely publicized within the US domestic truck market. Diesel truck and engine manufacturers placed 2007 EPA compliant diesel engines on their "Do Not Export" lists.

16. Freightliner, LLC circulated a "CRITICAL WARNING" to all US and Canadian dealers, stating its policy that "US and Canadian dealer sales of trucks equipped with EPA 2007 engines outside the US or Canada are expressly prohibited without previous authorization" due to a lack of "infrastructure that delivers diesel fuel according to the new standards." The Freightliner

memo warned of "damages" to the 2007 EPA compliant engine that would occur if non-ULSD was used, and that repair of such damages would not be covered by warranty. The Freightliner memo further stated: "**This means that only EPA 1998 engines, preferred, or EPA 2004 engines, are allowed by Freightliner LLC policy to be sold to the Export markets. EPA 2007 engines MUST NOT BE EXPORTED outside of the US or Canada.**" (Emphasis in original.)

17.     Darley, as a US diesel fire truck manufacturer and seller and diesel fuel consumer knew or should have known of these developments in the US domestic market for diesel engines and fuel. Al Maha did not. Darley, with its undisputed expertise in its field of international sales of firefighting apparatus, knew or should have known that an international customer such as Al Maha would rely upon Darley's skill or judgment to select or furnish fire trucks with the appropriate engine for the customer's domestic market, whatever the customer's needs or specifications as to type of firefighting apparatus for the international customer's use.

18.     In late 2007 and early 2008, Al Maha was negotiating with Petro Rabigh, a new oil refinery being developed by Saudi ARAMCO, to provide Fire and Rescue manpower services at the facility, and to acquire and lease fire trucks to Petro Rabigh and to acquire and sell firefighting equipment to Petro Rabigh.

19.     On July 15, 2007, Al Maha hired Chris Gale, an American expatriate with experience as a fire chief, under contract, to be its Project Manager and Fire Chief for the Petro Rabigh facility. On August 1, 2008, the parties entered into a new contract, whereby Gale was promoted to Executive Project Manager.   Gale's salary under the second contract was approximately US$7,700 per month, with an equivalent annual performance bonus. Both contracts prohibited Gale from "directly or indirectly engag[ing] in any other employment, service or business as long as he is employed by [Al Maha]." The requirement of a senior full-time staff

member to devote himself exclusively to the requirements of his employer and not to act as a covert agent of a supplier to his employer is inherent in contracts of employment both in the U.S. and abroad. Darley knew or should have known that the same requirement would apply to the terms of employment of the persons with whom Darley deal at Al Maha.

20. Gale reported to Khalid Al-Qahtani, Al Maha's CEO, and to Sulaiman Al Enizi, Al Maha's Vice President. Al Enizi was under contract and served both Al Maha and GBN. Al Enizi's contract provided that he had a duty of loyalty. Al Enizi and Gale were primarily responsible for negotiating the Petro Rabigh contract.

21. Al Maha's instructions to Gale regarding the Petro Rabigh contract were simple: find and recommend a supplier or suppliers who can provide the fire trucks and equipment for the Petro Rabigh contract. CEO Khalid Al-Qahtani retained final authority for any purchase.

22. Gale advised CEO Khalid Al-Qahtani that Darley was the "best in the business," the biggest in the field, and eminently qualified to assist in fulfilling the Petro Rabigh contract. Gale stated that he knew Darley well, respected it, and had an excellent relationship with Darley. Gale did not disclose to his CEO Khalid Al-Qahtani that he had or would propose to enter into arrangements with Darley whereby he would act as Darley's covert agent in securing the contract for Darley in return for the payment of a bribe that was many multiples of his salary from Al Maha.

23. On February 28, 2008, Gale sent an email from his GBN email account to Paul Darley and Peter Darley stating that he was seeking fire trucks for Al Maha to lease to Petro Rabigh. Gale described four fire trucks that he was seeking: an industrial aerial platform; an industrial fire pumper ("similar to the Cyclone II from E-One"), a water tanker pumper, and a foam tanker. With respect to the engine, Gale merely specified, "All apparatus shall have diesel engines." Gale further specified that, "per client regulations and Saudi Law, we will need to have

a full warranty [on each truck]."

24.     Gale expressed urgency, but then stated that if Darley did not have the fire trucks in stock, "you have to locate from another source."

25.     In an email to Gale dated May 1, 2008, Peter Darley and Paul Darley quoted Darley's price to Al Maha for the six fire trucks that Al Maha eventually purchased. Specifically, in four Darley pro forma invoices attached to an email, Darley quoted the following prices:

- Water Tanker with 2000 gallon tank:     $168,620.00
- Industrial Pumper:     $775,000.00
- 100' Rear Mount Aerial Platform:     $927,000.00
- (3) 2-Door International Pumpers     $258,000.00 ea. ($774,000.00 total)
  TOTAL PRICE:     $2,644,620.00

26.     Neither Darley nor Gale provided Darley's four pro forma invoices with the above quotes to Al Maha.

27.     Darley also provided Gale with the following quotes for equipment:

- Fire Hose:     $132,423.00
- Rescue Equipment:     $215,180.00
- Hazmat:     $120,865.00
- SBCA:     $321,635.00
- PPE:     $239,605.00
- Misc (Equipment):     $243,175.00

28.     Neither Darley nor Gale provided these quotes for equipment to Al Maha.

29.     Rather than negotiate the prices with Darley or seek competing bids, on May 20, 2008, Gale sent Paul Darley and Peter Darley an email soliciting a bribe for Gale to recommend that Al Maha purchase the fire trucks and equipment from Darley. Gale requested that Darley falsify its pro forma invoices to reflect a new, *higher* price quote to Al Maha for the fire trucks and equipment. The price quote that reflected the over $470,000 bribe was as follows:

> **Vehicles**
> Water Tanker x (1) $207,000
> Industrial Foam Pumper - $850,000

Aerial Pumper - $1,015,000
Pumpers x (3) - $859,000

**Equipment**
Fire Hose - $146,000
Rescue Equipment - $242,000
HazMat - $136,000
SCBA - $131,000
PPE - $259,000
Miscellaneous - $315,000

30.     The next day, in an email to Gale dated May 21, 2008, Peter Darley and Paul Darley agreed to falsify the quotes and pay Gale a bribe of over $470,000—over five times Gale's annual salary that Gale received from his principal Al Maha.

31.     Gale, Darley, Peter Darley and Paul Darley executed the bribe relating to the fire trucks without notice to Al Maha by colluding to increase Darley's price to Al Maha by 12% or $317,354. Gale, Darley, Peter Darley and Paul Darley falsified Darley's pro forma invoices to Al Maha for the fire trucks.

32.     Similarly, on the equipment transaction, Gale, Darley, Peter Darley and Paul Darley conspired to increase Darley's price to Al Maha by 12% or $152,746.48, all acting together to falsify Darley's quotes on the equipment.

33.     Thus, the total amount of bribes that Darley agreed to pay Gale to influence the transactions with Al Maha was $470,100.48—over five times the annual salary Gale received from his principal Al Maha. Darley made the bribe payments to Gale as kickbacks after Darley received payments from Al Maha.

34.     Al Maha paid Darley the total purchase price for the fire trucks ($2,931,000.00) and equipment ($1,434,000.00) (total: $4,365,000) by letters of credit and wire transfers between about July 2008 (when Al Maha paid $271,000.00) and March 2009.

35.     Al Maha relied on Darley's representations in its pro forma invoices. Al Maha

would not have agreed to the sale if Al Maha had known that the price included payments totaling $470,000 to its agent Gale—over five times the amount that Al Maha paid Gale annually to render service on behalf of Al Maha.

36.     On November 5, 2009, immediately after Al Maha made payment on one of the fire trucks, Gale sent an email to Peter Darley in which he requested "the first wire transfer of $75,000 against the fire truck in Dubai." Gale gave wire instructions for his secret bank account in Bahrain. Peter Darley immediately authorized payment of the bribe and the payment went out the same day. At no time did Peter Darley or any other person on Darley's behalf inform Al Maha that Peter Darley had authorized payments to Al Maha's senior employee, its Fire Chief and Executive Project Manager, who had major responsibilities to Al Maha for the commercial success of Al Maha's purchase from Darley and for the safety of Al Maha's firefighting staff and for the customers of Al Maha's services, that were far in excess of Gale's annual salary and that such payments were being made to Gale's foreign bank account, Bahrain being a separate country from Saudi Arabia.

37.     In later November 2008, Peter Darley was concerned that Al Maha's payments to Darley were slowing down. Peter Darley suspected that Gale's immediate superior, Vice President Al Enizi, was the cause. On November 20, 2008, Peter Darley emailed Gale: "I also ask that you resolve what is needed with Sulaiman [Al-Enizi] and provide me with a united direction for… payments as this may also be part of reason for the delay on your end."

38.     Petro Rabigh cancelled Al Maha's contract, effective December 23, 2008. But the parties continued negotiations in an attempt to resolve differences.

39.     In a January 5, 2009 email to Peter Darley, Gale (on his personal email account) indicated that he and Al Enizi had agreed to split Gale's bribe money "50/50." On January 6,

2009, Gale (again from his personal email account) informed Peter Darley of confidential Al Maha information that relations with Petro Rabigh had improved and Al Maha was waiting for a decision whether Petro Rabigh would lease or purchase the trucks from Al Maha.

40.    In an email dated January 19, 2009, on his personal (nonbusiness) email account to Paul Darley, Gale disclosed that he had learned from Petro Rabigh, with whom Gale was dealing on behalf of Al Maha, that Petro Rabigh had "somehow located another source for the vehicles." Gale then recommended that Darley:

> allow GBN to submit the LC's [Letters of Credit] for your approval. The bank from here will settle [pay] the LC with you. This will be done at the time of loading from your warehouse as we have already been in discussions with our freight inspector. Once the inspection is completed, there will be a representative from GBN at your location that will contact our bank here and authorize the payment.
> *My one and only concern is that you do not take any losses on this at all. Petro Rabigh and GBN [Al Maha] can battle this out however they want to as long as the end of the day, you still receive payment.*

41.    In short, Gale, using confidential Petro Rabigh information that he obtained as Al Maha's agent, which he did not disclose to Al Maha, informed Darley that Petro Rabigh had secured a source other than Al Maha for the fire trucks, and thus would not need to complete negotiations with Al Maha to obtain the fire trucks that it needed. Based upon this information, Gale advised Darley to act promptly to secure payment for the fire trucks from Al Maha, before Al Maha learned that its only potential customer for the fire trucks, Petro Rabigh, would not be needing them from Al Maha, and, presumably, to help Darley avoid the risk that Al Maha would not complete payment for the fire trucks when it no longer had a customer for them. This email speaks volumes as to the extent to which Darley's bribe payments to Gale had utterly and absolutely corrupted him.

42.    In February 2009, Al Maha had the five fire trucks that were in the United States

(Ferrara had one on display in Dubai) inspected by SGS. Per contract, SGS's inspection was limited to confirming that the trucks met specifications – that Darley had provided to Gale – and were operational and in good working order. SGS's inspection reports were submitted to Gale.

43.     On March 3, 2009, Peter Darley sent an email to Gale stating that Darley had received final payment from Al Maha, "so send me a final breakdown and agreed upon wire info with sulamain [sic] [Al-Enizi]." Gale promptly emailed Peter Darley wire instructions for his and Al Enizi's secret bank accounts in Bahrain. On March 6, 2009, Peter Darley sent an email to Darley's Chief Financial Officer authorizing payments of bribes (50/50) by wire transfer to Gale's and Al-Enizi's secret accounts, in the amounts of $166,873.00 each. The wires transfers were sent of March 9, 2009.

44.     Immediately after receiving the final bribe installment, in March 2009, Gale resigned from Al Maha. Al Enizi resigned shortly thereafter.

45.     Darley's bribe kickbacks to Gale and Al-Enizi totaled at least $408,746.

46.     Darley's invoices from Ferrara, from whom Darley purchased five of the six fire trucks, indicates a total price of $2,214,679. The invoice from Midwest Fire shows that Darley paid $152,387.00 for the sixth fire truck. Thus, Darley's original mark-up on the May 1, 2008 invoices for the fire trucks was $277,554 – roughly an amount Al Maha could have saved if Gale had purchased direct from Ferrara and Midwest Fire. The difference between the purchase price that Darley paid for the fire trucks and the amount Al Maha paid with Darley's mark up and the fraudulent bribery-kickback charges was $716,321.

47.     The fire trucks arrived in Saudi Arabia between April and June, 2009. The fire trucks were kept safe in a private secured lot in Al Khobar owned by Al Maha's logistics supplier. They were washed and cleaned weekly.

11

48.     During 2009 and 2010, there were back-and-forth negotiations between Al Maha and Petro Rabigh concerning the fire trucks and equipment, with Petro Rabigh showing interest in purchasing the fire trucks. Negotiations were delayed by management changes at Petro Rabigh.

49.     In April 2010, Petro Rabigh had a technical team from Saudi ARAMCO inspect the fire trucks. On May 2, 2010, and again on August 16, 2010, Petro Rabigh sent an email to Al Maha inquiring: (1) "what type of diesel fuel is suitable" for the engines and whether "there is a certificate stating that this engine is compatible with the type of diesel fuel in Saudi Arabia." Petro Rabigh and Saudi ARAMCO knew that only LSD, not ULSD, was available in Saudi Arabia. Petro Rabigh also asked if there was a "local or regional dealer for Ferrara" or for the Maxxforce 9 Engine that some of the fire trucks were equipped with.

50.     On May 16, 2010, Ameen Zirikly, who had replaced Al Enizi as Vice President at Al Maha, sent an email to Peter Darley asking, with regard to the engines in the fire trucks, "Were they ordered and supplied as Saudi Specifications; or were they based on US Specifications (particularly with Engine compatibility to Saudi Diesel Specifications (Not the USA ULSD type of Diesel)?" As no response was received, a follow up email was sent on May 26, 2010.

51.     Peter Darley replied by email to Zirikly on May 27, 2010, but did not respond to Zirikly's question concerning order specifications for the engines. Zirikly repeated his email requests, and further asked for confirmation that Darley knew the fire trucks were being shipped to Saudi Arabia, in an email to Peter Darley dated May 26, 2010 (the date inconsistency is apparently due to the eight hour time difference between Chicago and Al Khobar, Saudi Arabia).

52.     In his further reply of May 27, 2010, Peter Darley stated, "We asked about the engine and fuel requirements – we were told the only criteria was that they should be diesel engines and that fuel availability (hi / low sulfer) was not an issue." Peter Darley made no mention of what

disclosures, if any, Darley made to Gale to the effect that 2007 EPA compliant diesel engines were not for export outside the US and Canada due to the lack of infrastructure for ULSD distribution in the rest of the world. He did not address the question of whether Darley knew the trucks were being shipped to Saudi Arabia.

53.     On October 31, 2010, Petro Rabigh (which, as noted above, was Saudi ARAMCO's newest oil refinery/petrochemical complex in Saudi Arabia) sent an email to Zirikly expressing an interest in purchasing one of the three Ferrara International Pumpers, requesting as follows:

> A certificate/statement from the engine manufacturer confirming that the engine will operate using the type of diesel available in the Saudi market without any problems. The Maxxforce 9 manufacturer specifications mention that Ultra-Low Sulfur Diesel Fuel is required for this engine. *This type of diesel is not available in Saudi Arabia.* [***] If such certificate/confirmation is provided, we can then proceed with the next step which is conducting a pump performance test. (Emphasis added.)

54.     In about November 2010, Al Maha retained Anthony Capucci, a semi-retired fire chief with extensive international experience, to investigate and advise it on the diesel engine/diesel fuel issue. Following extensive communications with the subject diesel engine manufacturer's representatives, other diesel engine experts, fuel distributors in Saudi Arabia and others knowledgeable about diesel fuel distribution in Saudi Arabia, Capucci found that: (1) the subject engines could not be run on LSD, only ULSD, without causing extensive engine damage after only a couple of tankfuls; (2) that, due the extreme demands placed upon fire truck engines when in a fire fighting situation, in particular at an oil refinery-petrochemical complex like Petro Rabigh, the risk of engine malfunction and the ensuing risk to life and property from using Darley's fire trucks were clearly unacceptable; (3) that the subject engines could not, for all practical purposes, be retrofitted to run on LSD; (4) that the subject engines were on their manufacturer's "do not export" lists; (5) that only LSD, not ULSD, was available in Saudi Arabia; and (6) that the

manufacturers would not honor the warranties on the trucks' engines if used in Saudi Arabia.

55.     Al Maha filed its Complaint on March 16, 2012.

### Counts

### COUNT I
### Common Law Fraud And Conspiracy
### Against Darley, Peter Darley And Paul Darley

56.     Al Maha repeats and incorporates by reference the allegation contained in paragraphs 1-55 as if fully set forth herein.

57.     By submitting the "revised" pro forma invoices to Al Maha on or about May 21, 2008, from its office in Illinois, with the consent and authorization of Peter Darley and Paul Darley, Darley made false statements of material fact by marking up the invoices with fraudulent sums to cover bribe payments to Gale and by half-truths, failing to disclose, under circumstances giving rise to a duty to disclose, that Darley agreed to make bribe-kickback payments to Gale as a *quid pro quo* for persuading Al Maha to purchase the fire trucks and equipment from Darley, without Al Maha's knowledge or consent.  Darley's actions were deliberate, willful and wanton.

58.     Defendants knew that the information contained in Darley's "revised" pro forma invoices that Darley provided to Al Maha were false and intended that Al Maha rely on the Defendant's representations.

59.     Al Maha justifiably relied on the Defendants' representations and in doing so remitted about $4,365,000.00 by wire transfer and letter of credit to Darley at their headquarters in Illinois.

60.     Non-party Gale also conspired in the fraud alleged herein, by participating in the *quid pro quo* bribery-kickback scheme with Darley and by participating in the preparation of the fraudulent invoices.

14

61. Al Maha has been damaged by the fraud perpetrated upon it by Defendants, including, but not limited to, amounts totaling in excess of $2,900,000 for inflated premiums for the purchase of the fire trucks and equipment and because Al Maha could not lease, resell or use the fire trucks in Saudi Arabia, due to the unavailability of ULSD, and subsequently reimported the fire trucks to the US where they were refurbished and to date has sold five of the fire trucks in mitigation of damages, but nonetheless at a substantial loss.

WHEREFORE, Al Maha respectfully requests that the Court enter judgment in favor of Al Maha and against Darley, Peter Darley and Paul Darley, jointly and severally, in an amount of at least $2,931,000.00, or as proven by the evidence at trial, granting Al Maha an award for its incidental and consequential damages, punitive damages, Al Maha's reasonable attorneys' fees, and for such other and additional relief as is just and equitable.

## COUNT II
### Illinois Consumer Fraud Act
### Against Darley, Peter Darley And Paul Darley

62. Al Maha repeats and incorporates by reference the allegation contained in paragraphs 1-61 as if fully set forth herein.

63. The fraudulent acts of each of the Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS 505/1 *et seq.*, because the fraud occurred in the course of conduct involving trade or commerce.

WHEREFORE, Al Maha respectfully requests that the Court enter judgment in favor of Al Maha and against Darley, Peter Darley and Paul Darley, jointly and severally, in an amount of at least $2,931,000.00, or as proven by the evidence at trial, granting Al Maha an award for its incidental and consequential damages, punitive damages, Al Maha's reasonable attorneys' fees, and for such other and additional relief as is just and equitable.

## COUNT III
## Inducement And Participation In Breach Of Fiduciary Duty
### (Darley, Peter Darley and Paul Darley)

64.     Al Maha repeats and incorporates by reference the allegation contained in paragraphs 1-63 as if fully set forth herein.

65.     While employed by Al Maha, Gale owed a fiduciary duty and a duty of loyalty to Al Maha.

66.     While employed by Al Maha, Gale breached his fiduciary duties and duties of loyalty duties under his employment contract not to "directly or indirectly engag[ing] in any other employment, service or business as long as he is employed by [Al Maha]" by agreeing to accept, accepting, bribes from Darley as a *quid pro quo* to steer contracts for the purchase of fire trucks and equipment to Darley, by not seeking competing bids, by conspiring with Defendants to increase Al Maha's cost of the contracts by the amounts of the bribes, and by not seeking bids from legitimate fire truck manufacturers and distributors who would have refused to sell fire trucks for use in Saudi Arabia that required ULSD which was not available in Saudi Arabia.

67.     Defendants knowingly participated in and induced breaches of duty by Gale.

68.     Defendants obtained benefits from Gale's breaches of his duties to Al Maha, his employer.

WHEREFORE, Al Maha respectfully requests that the Court enter judgment in favor of Al Maha and against Darley, Peter Darley and Paul Darley, jointly and severally, in an amount of at least $2,931,000.00, or as proven by the evidence at trial, granting Al Maha an award for its incidental and consequential damages, punitive damages, Al Maha's reasonable attorneys' fees, and for such other and additional relief as is just and equitable.

## COUNT IV
### Breach Of Implied Warranty Of Fitness For A Particular Purpose
### Remedy Pursuant To Section 2-714 Of The UCC
### (Darley)

69.     Al Maha repeats and incorporates by reference the allegation contained in paragraphs 1-55 as if fully set forth herein.

70.     Section 2-315 of the UCC provides generally that every contract for the sale of goods contains an implied warranty of fitness for a particular purpose, as follows:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying upon the seller's skill and judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be for such purpose.

810 ILCS 5/2-315.

71.     Darley at the time of contracting had reason to know that Al Maha required fire trucks that, in addition to meeting express specifications, would be fit for the purpose of use in Saudi Arabia; and (2) that Al Maha was relying on Darley's skill and judgment to select and furnish and fire trucks that, in addition to meeting express specifications, would be fit for the purpose of use in Saudi Arabia.

72.     Darley breached the implied warranty of fitness for a particular purpose, because the fire trucks that Darley selected and furnished had 2007 EPA compliant diesel engines, which required ULSD, which was not available in Saudi Arabia.  Only LSD was available in Saudi Arabia, and running the fire trucks on LSD would cause substantial engine damage and failure.

73.     Al Maha paid the purchase price for the fire trucks and performed all other terms and conditions not otherwise excused.

74.     Section 2-714 of the UCC sets forth the buyer's damages for breach in regard to accepted goods, as follows:

(1)     Where the buyer has accepted goods and given notice (subsection 3 of Section 2-607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable;

(2)     The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3)     In a proper case any incidental and consequential damages under the next section may also be recovered.

810 ILCS 5/2-714.

75.     Pursuant to section 2-715 of the UCC, a buyer may recover incidental and consequential damages resulting from the seller's breach. 810 ILCS 5/2-715.

76.     To the extent that Al Maha may be deemed to have accepted the fire trucks, Al Maha provided Darley with sufficient notice pursuant to section 2-607 of the UCC. Darley's tender of the fire trucks was non-conforming in that Darley tendered fire trucks that did not conform to the implied warranty of fitness for a particular purpose, namely equipped with diesel engines that could be used in Saudi Arabia, where only LSD was available.

WHEREFORE, Al Maha respectfully requests that the Court enter judgment in favor of Al Maha and against Darley in an amount of at least $2,931,000.00, or as proven by the evidence at trial, granting Al Maha an award for its incidental and consequential damages, Al Maha's reasonable attorneys' fees, and for such other and additional relief as is just and equitable.

## COUNT V
### Equitable Remedies Of Rescission And Restitution For Mutual Mistake
#### (Darley)

77.     Al Maha repeats and incorporates by reference the allegation contained in paragraphs 1-55 as if fully set forth herein.

78.     Under Illinois law, rescission for mutual mistake is proper where (1) the mistake is of a material nature; (2) the mistake is of such consequence that enforcement is unconscionable;

(3) the mistake occurred notwithstanding the exercise of due care by the party seeking rescission; and (4) rescission can place the other party in *status quo*.

79.     Under the facts set forth above, rescission and restitution for mutual mistake is proper with regard to the aerial platform truck, which is the one truck remaining that Al Maha has not yet sold in mitigation of its damages.

WHEREFORE, Al Maha respectfully requests that the Court enter judgment in favor of Al Maha and against Darley rescinding the contract for the purchase of the aerial platform truck and awarding a money judgment award to Al Maha in at least the amount of $1,015,000.00, or as proven by the evidence at trial, granting such other and additional relief as is just and equitable, and granting Al Maha its incidental and consequential damages.

**COUNT VI**
**Equitable Remedies Of Rescission And Restitution For Unilateral Mistake**
**(Darley)**

80.     Al Maha repeats and incorporates by reference the allegation contained in paragraphs 1-55 as if fully set forth herein.

81.     Under Illinois law, rescission for unilateral mistake is proper where (1) the mistake is of a material nature; (2) the mistake is of such consequence that enforcement is unconscionable; (3) the mistake occurred notwithstanding the exercise of due care by the party seeking rescission; and (4) rescission can place the other party in *status quo*.

82.     Under the facts set forth above, rescission and restitution for unilateral mistake is proper with regard to the aerial platform truck, which is the one truck remaining that Al Maha has not yet sold in mitigation of its damages.

WHEREFORE, Al Maha respectfully requests that the Court enter judgment in favor of Al Maha and against Darley rescinding the contract for the purchase of the aerial platform truck and

awarding a money judgment award to Al Maha in at least the amount of $1,015,000.00, or as proven by the evidence at trial, granting such other and additional relief as is just and equitable, and granting Al Maha its incidental and consequential damages.

Al Maha Trading & Contracting Holding Company

By: /s/ William M. Ejzak
        Its Attorney

William M. Ejzak
118 S. Clinton St., Suite 200
Chicago, IL 60661
Ph.: (312) 327-3371
Fax: (312) 377-2402
ARDC No.: 6206836

**CERTIFICATE OF SERVICE**

I, William M. Ejzak, certify that I caused a copy of the foregoing *Al Maha's Amended Complaint* to be served upon to be served upon the party listed below by the Clerk of the Court using the CM/ECF system which will send notification of such filing on this 12th day of November 2013:

>       Frank Citera
>       Frank Del Aquila
>       Brett Doran
>       Greenberg Traurig
>       77 W. Wacker, Suite 3100
>       Chicago, IL 60601

                                        /s/  William M. Ejzak
                                        William M. Ejzak