IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AL MAHA TRADING & CONTRACTING HOLDING COMPANY, a Saudi Arabian limited liability company,<br><br>    Plaintiff,<br><br>    v.<br><br>W.S. DARLEY & CO., an Illinois corporation, PETER DARLEY, and PAUL DARLEY,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) )  No. 12 C 1920 |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On November 12, 2013, Plaintiff Al Maha Trading & Contracting Holding Company ("Al Maha") filed a six-count Amended Complaint (Dkt. No. 51, "Am. Compl." or "Amended Complaint") against Defendants W.S. Darley & Co. ("Darley"), Peter Darley, and Paul Darley (Peter and Paul Darley collectively referred to as the "Individual Defendants," and with Darley the "Defendants"). In the Amended Complaint's first three counts, Al Maha purports to allege common law fraud and conspiracy (Count I), violation of the Illinois Consumer Fraud Act (Count II), and inducement and participation in breach of fiduciary duty (Count III) against the Defendants. (*Id.* ¶¶ 56-68.)

These three purported claims arise out of Al Maha's allegations that Defendants provided Al Maha inflated invoices for fire trucks and equipment as part of a "bribery-kickback" scheme. (*Id.*) According to Al Maha, Defendants agreed to pay Al Maha's Project Manager and Fire

Chief, Christopher Gale ("Gale"), if he ensured that Al Maha purchased fire trucks and equipment from Darley. (*Id*.)

Before the court are two motions filed by Defendants, Defendants' "Joint Rule 12(b)(6) Motion to Dismiss Counts I-III of Plaintiff's Amended Complaint" (Dkt. No. 73, "Defs' Mot." or the "Motion to Dismiss"), and "Joint Rule 11 Motion for Sanctions" (Dkt. No. 70, "Rule 11 Mot." or "Rule 11 Motion"). Plaintiff Al Maha filed a motion to strike, or in the alternative for leave to file a surreply (Dkt. Nos. 98, 104), which the court took under advisement (Dkt. Nos. 103, 107).

Because each of these pending motions arise out of a common nucleus of facts, the court will analyze them together. As a preliminary matter, the court grants Al Maha leave to file both surreplies. For the reasons set forth below, this court denies both Defendants' Motion to Dismiss and Joint Rule 11 Motion for Sanctions in their entirety.

## BACKGROUND

**Procedural History**

On March 16, 2012, Al Maha filed its initial Complaint asserting 12 claims against Darley. (Dkt. No. 1.) These claims chiefly alleged that Darley had breached the implied warranty of fitness for a particular purpose, by selling Al Maha six fire trucks that could not operate in Saudi Arabia. (*Id*.) Al Maha also asserted claims based on Darley's alleged failure to disclose these facts. (*Id*.) On July 23, 2012, Darley moved to dismiss Al Maha's initial complaint in its entirety. (Dkt. No. 15.) The court dismissed several of Al Maha's claims but allowed others to remain pending. (Dkt. No. 27 at 1.)

At an October 22, 2013 status conference, the court granted Al Maha leave to file a new pleading. (Dkt. No. 47.) Again, on November 12, 2013, Al Maha filed its Amended Complaint

(Dkt. No. 51), asserting in Counts I-III claims for common law fraud and conspiracy, violation of the Illinois Consumer Fraud Act, and inducement and participation in breach of fiduciary duty, respectively. (*Id.* ¶¶ 56-68.) Al Maha added two additional defendants to Counts I-III, namely Paul Darley, Darley's President and Chief Executive Officer, and Peter Darley, Darley's Executive Vice President and Chief Operating Officer. (*Id.* ¶ 6.) Counts I-III, again, revolve around the allegations that Defendants provided inflated invoices to Al Maha to cover the cost of bribing Al Maha's employee Gale to steer business to Darley. (*Id.* ¶¶ 56-68.)

On January 17, 2014, Defendants moved to dismiss Counts I-III of the Amended Complaint, (Dkt. No. 73), and this motion was initially fully-briefed on March 27, 2014, (Dkt. No. 97, the "Reply"). However, Al Maha moved to strike alleged new arguments in Defendants' Reply, or, in the alternative, for leave to file a surreply. (Dkt. No. 104.) As a result, the Motion to Dismiss was not fully briefed until April 15, 2014. (Dkt. No. 107.)

On January 13, 2014, Defendants moved, pursuant to Rule 11 of the Fed. R. Civ. Pro., for an order imposing sanctions also based on the Amended Complaints allegations of a bribery-kickback scheme. (Dkt. No. 70.) This motion was initially fully-briefed on March 13, 2014. (Dkt. No. 95, "Rule 11 Reply".) However, again, Al Maha moved to strike alleged new arguments in the Rule 11 Reply, (Dkt. No. 98), resulting in the Rule 11 Motion not being fully briefed until April 2, 2014, (Dkt. No. 102).

**Al Maha's May 2008 Factual Allegations**

Al Maha is organized under the laws of the Kingdom of Saudi Arabia with its principal place of business in Al Khobar, Saudi Arabia. (Am. Compl. ¶ 4.) Since about 1982, Al Maha has "provid[ed] manpower services in the fields of Fire and Rescue to customers exclusively in Saudi Arabia, principally in the fields of marine, aviation and industrial activities." (*Id.* ¶10.)

From July 2007, Gale was Al Maha's contractual employee, holding the position of Fire Chief, Project Manager, and later Executive Project Manager. (Am. Compl. ¶19.) Gale's Employment Contracts prohibited him from "directly or indirectly engag[ing] in any other employment, service or business as long as he is employed by [Al Maha]." (*Id*.) Gale reported to Khalid Al-Qahtani ("Al-Qahtani"), Al Maha's CEO, and to Sulaiman Al Enizi ("Al Enizi"), Al Maha's Vice President. (*Id*. ¶ 20.) Gale was responsible for recommending to Al Maha fire truck and equipment sellers. (*Id*. ¶ 21.)

On February 26, 2008, Gale made his first contact with Darley, in an email to Individual Defendants, stating that he was seeking to lease fire trucks for Al Maha. (*Id*. ¶ 23; *see also* Dkt. No. 91, "Pl's Resp.", Ex. 3.) The text of this email was specifically addressed to "Paul". (Pl's Resp., Ex. 3.)

From February 26, 2008 to late May 2008, Paul Darley directly sent or received ten emails to or from Gale relating to Al Maha's potential purchase of fire trucks and equipment. (Pl's Resp., Exs. 3-4, 8.) On May 1, 2008, Peter Darley sent an email to Gale, copying Paul Darley, and attaching Darley's initial pro forma price quotes to Al Maha for fire trucks and equipment. (Am. Compl. ¶ 25; Pl's Resp. Exs. 5-6.)

Gale did not attempt to negotiate a price reduction from Darley and did not seek bids from Darley's competitors. (Am. Compl. ¶ 29.) Instead, on May 20, 2008, Gale sent Paul and Peter Darley an email requesting that Darley alter its pro forma invoices to reflect new, *higher* price quotes to Al Maha for the fire trucks and equipment. (*Id*. ¶ 29; Pl's Resp. Ex. 8.) Gale stated, "Here is the pricing list that we would like to have indicated on the pro-forma quotations per the commission fee." (Pl's Resp., Ex. 8.) The text of the email was again specifically addressed to "Paul". (*Id*.)

On May 21, 2008, Peter Darley emailed Gale and another Darley employee, copying Paul Darley. (Am. Compl. ¶ 30; Pl's Resp. Exs. 8-10.) In this email, Peter Darley provided Gale the new invoices as requested, adopted the higher prices Gale sought in his May 20, 2008 email, and even highlighted the original, lower quotes in a side-by-side comparison with the new prices. (*Id*.)

Al Maha relied upon Darley's representations in its May 21, 2008 invoices for fire trucks and equipment. (Am. Compl. ¶ 35.) Neither Gale nor Defendants disclosed to Al Maha that Darley's price quotes had been increased to pay Gale a "commission", nearly five times his annual salary. (*Id*.) Gale advised Al-Qahtani about the desirability of making its purchases from Darley, (*Id*. ¶ 22), and Al-Qahtani approved payment of Darley's price quotes based on Gale's recommendation, (Pl's Resp. at 13). Between July 2008 and March 2009, Al Maha paid Darley $2,931,000.00 for the fire trucks and $1,434, 000.00 for the equipment. (Am. Compl. ¶ 34; Pl's Resp., Ex. 11.)

**Requested Inferences from the May 2008 Allegations**

Al Maha argues that there are several key, reasonable inferences that must be drawn from the above emails. First, even though the emails do not specifically state that the commission would be paid to Gale, (Pl's Resp., Ex. 8), it would be inconsistent with typical business practices for Darley as the seller to pay a commission to Al Maha the buyer, (Pl's Resp. at 6, 9). Such a commission would come out of Al Maha's own payment to Darley for the fire trucks and equipment. (*Id*.) Instead, Al Maha argues a reasonable inference is that Gale intended, and the Individual Defendants understood that Gale was soliciting a payment for himself. (*Id*. at 6-7.)

Additionally, Al Maha argues comparing Darley's original price quotes with Gale's requested price list shows that Gale's prices were $470,000 higher, making it reasonable to infer

that difference was the payment Gale anticipated.  (Am. Compl. ¶¶ 25, 27, 29; Pl's Resp. Exs. 6, 8-10.)  According to Al Maha, the fact that Gale's proposed price list did not separately break out this commission also supports the inference that Gale intended and the Individual Defendants understood that Gale's payment would not be disclosed to Al Maha.  (Pl's Resp. at 7.)

Al Maha believes that various facts support the inference that Darley intended to influence Gale through its payment.  Individual Defendants, in spite of their business experience, failed to question Gale on whether Al Maha authorized the payment, ignoring various warning signs to the contrary.  (*Id*. at 10.)  Gale requested payment after receiving Darley's initial price quotes, and that amount was added to Al Maha's purchase price.  (*Id*. at 11.)  The substantial amount of this payment, $470,000, itself supports the inference it was intended to influence Gale.  (*Id*. at 11.)

Al Maha also points to various facts to support the inferences Paul Darley knew Gale was asking Darley to inflate its invoices, pay Gale these excess funds, and conceal this plan from Al Maha.  Al Maha argues that Paul Darley was Darley's point person for negotiating various aspects of the purchase with Gale.  (*Id*. at 11; *see also id*. Exs. 3-4, 8.)  Additionally, Paul Darley was copied on Peter Darley's email attaching Darley's original quotes, and in response Gale specifically sent his email requesting that the quotes increase to Paul Darley.  (*Id*. at 11; *see also id*. at Ex. 8.)  Finally, Paul Darley was copied on Peter Darley's email to Gale were the former agreed to increase the invoices and also pay a commission.  (*Id*. Exs. 8-10.)

Al Maha believes it is unlikely Peter Darley would have acted unilaterally in approving the payment to Gale, considering (1) Gale's initial request for payment was sent to Paul Darley and (2) Peter Darley copied Paul Darley on his response email.  (*Id*.)  Rather, Al Maha believes

Paul Darley gave either explicit or implicit consent to Peter Darley when he allegedly approved payment to Gale.  (*Id*.)

**Al Maha's Factual Allegations from November 2008 to March 2009**

On November 5, 2008, immediately after Al Maha made payment on one of the fire trucks, Gale sent an email to Peter Darley, requesting "the first wire transfer of $75,000 against the fire truck in Dubai."  (Am. Compl. ¶ 36; Pl's Resp., Ex. 12.)  Gale gave wiring instructions to a personal bank account in Bahrain.  (*Id*.)  Peter Darley immediately authorized payment to Gale's account, and Darley wired payment that same day.  (*Id*.; *see also* Pl's Resp., Ex. 13.)

In late November, Peter Darley was concerned that Al Maha's payments to Darley were slowing down.  (Am. Compl. ¶ 37; Pl's Resp. Ex. 14.)  Peter Darley suspected that Gale's immediate supervisor, Al Enizi, was the cause.  (*Id*.)  On November 20, 2008, Peter Darley emailed Gale, stating: "I also ask that you resolve what is needed with Sulaiman [Al Enizi] and provide me with a united direction for commission payments as this may also be part of the reason for the delay on your end."  (*Id*.)

In a January 5, 2009 email to Peter Darley, Gale indicated that he and Al Enizi had agreed to split the payment 50/50.  (*Id*. ¶ 39; Pl's Resp., Ex. 15.)  On March 3, 2009, Peter Darley sent an email to Gale stating: "we red [sic] final pay today so send me final breakdown and agreed upon wire info with sulamain [Al Enizi]."  (Am. Compl. ¶ 43; Pl's Resp. Ex. 18.)  Gale promptly emailed Peter Darley with wiring instructions for his and Al Enizi's bank accounts in Bahrain.  (*Id*.)  On March 6, 2009, Peter Darley sent an email to Darley's CFO authorizing wire transfers to Gale and Al Enizi's bank accounts in Bahrain for $166,873 each. (*Id*.)  These wire transfers were sent on March 9, 2009.  (Am. Compl. ¶ 43; Pl's Resp. Ex. 19.)

Immediately after receiving the March 9, 2009 payment, Gale resigned from Al Maha, and Al Enizi resigned shortly thereafter. (Am. Compl. ¶ 44.)

**Al Maha's Requested Inferences from Nov. 2008 to Mar. 2009 Allegations**

Al Maha believes the fact Gale requested payment for himself and Al Enizi, which Peter Darley approved without hesitation, confirms that Gale and Peter Darley understood that the commission referred to in the May 20 and 21, 2008 emails would be paid if Al Maha purchased the fire trucks. (Pl's Resp. 13.) According to Al Maha, it is a reasonable to infer that Darley's payments to Gale were a payoff for influencing Al Maha to purchase the fire trucks at an inflated price. (*Id*.) The fact these payments were made to Gale's personal bank account in Bahrain further demonstrates that they were not disclosed to Al Maha. (*Id*. at 14.)

Al Maha argues that in Peter Darley's November 20, 2008 email he was inviting Al Enizi to request a bribe to expedite payment of Al Maha's purchase of fire trucks and equipment. (*Id*.) Additionally, based on Gale's January 5, 2009 email to Peter Darley, Al Maha believes it is reasonable to infer that Al Enizi agreed to accept 50 percent of Darley's agreed payment to Gale, in exchange for expediting payment to Darley. (*Id*.) According to Al Maha, the fact that the payments were made to Al Enizi's personal bank account in Bahrain further demonstrates that they were not disclosed or consented to by Al Maha. (*Id*.)

<u>**LEGAL STANDARDS**</u>

**Motions to Dismiss Rule 12(b)(6) Legal Standard**

Under the Federal Rules of Civil Procedure, when deciding a Rule 12(b)(6) motion, the court "construe[s] the . . . [c]omplaint in the light most favorable to Plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in his favor." *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011). A complaint need contain only "a short and

plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

However, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Though "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555.

The complaint must "include sufficient facts 'to state a claim for relief that is plausible on its face.'" *Cole*, 634 F.3d at 903. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**Rule 11 Legal Standard**

Federal Rule of Civil Procedure 11 requires an attorney to undertake a reasonable inquiry before filing court papers and prohibits attorneys from filing pleadings that are filed for an improper purpose, are not warranted by existing law or a non-frivolous argument for the extension of existing law, or do not have evidentiary support. *See Cuna Mut. Life Ins Soc'y. v. Off. Prof'l Emps. Int'l Union, Local 39*, 443 F.3d 556, 560-61 (7th Cir. 2006).

Specifically, Rule 11(b) provides, in pertinent part, that by presenting a pleading to the court, the attorney filing the pleading certifies to the best of the person's knowledge, information, and belief, formed after a reasonable inquiry, that:

> (2)     the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3)     the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery;

Non-compliance with Rule 11(b) subjects the attorney and parties filing the offending pleadings to sanctions under Rule 11(c).

## ANALYSIS

**1.     Fraudulent Misrepresentation, Concealment or Conspiracy (Count I)**

Count I is titled "Common Law Fraud and Conspiracy" and asserted against all Defendants.  In this count, Al Maha alleges that Darley, "with the consent and authorization of Peter Darley and Paul Darely," submitted revised pro forma invoices to Al Maha, containing false statements of material fact by (1) "marking up the invoices with fraudulent sums to cover bribe payments to Gale" and (2) "failing to disclose, under circumstances giving rise to a duty to disclose, that Darley agreed to make bribe-kickback payments to Gale as a *quid pro quo* for persuading Al Maha to purchase the fire trucks and equipment from Darley".  (Am. Compl. ¶ 57.)

*a.     Fraudulent Misrepresentation*

According to the Illinois Supreme Court, fraudulent misrepresentation under Illinois law generally requires (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendants' intent that the statement induced the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff suffered damages as a result of relying on the statement.  *See, e.g., Connick v. Suzuki Motor Co. Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996).

In Al Maha's Motion to Dismiss Response (Dkt. No. 91), Al Maha summarizes its fraudulent misrepresentation claim as follows.  Al Maha alleges that "Darley's May 21, 2008 pro

formas for the fire trucks and equipment contained false statements of material fact." (*Id*. at 18.) The pro formas "did not reflect Darley's price quotes for the goods", rather they "reflected the price fixed by Gale and Defendants, which also included the undisclosed, purported third party payment to Gale." (*Id*.)

In their Motion to Dismiss (Dkt. No. 91), Defendants set out two major arguments against Al Maha's fraudulent misrepresentation claim. First, Defendants argue that the submission of an invoice by a merchant to a prospective customer, even if inflated, cannot support a claim for fraud, because it is axiomatic that a merchant can propose any sales price it desires. (Def's Mot. at 10.) Second, Defendants argue that Al Maha has "severely mischaracterized the emails" it relies on to support its "bribery-kickback" scheme. (*Id*.)

Defendants' argument that they were free to quote Darley any price, even in the alleged circumstances, has been expressly rejected by a district court in this district. In *Overland Bond & Inv. Corp. v. Mahoney*, No. 82-2283, 1984 WL 3997 (N.D. Ill. July 30, 1984) (McGarr, J.), defendant sellers had inflated their invoices to pay a kickback to the buyer's employee. *Id*. at *6. They then proceeded to argue that their invoices were not fraudulent, because they did not contain any misrepresentation. *Id*.

In a well-reasoned opinion, then Chief Judge Frank McGarr held that because "defendants issued sales tickets and invoices for automobiles sold to [plaintiff] which contained inflated purchase prices", "[c]learly, defendant's issuance of these invoices constituted a misrepresentation." *Id*. The "invoices contained false information because they did not reflect the price bid for the cars at auction", "rather, they reflected the price fixed by the defendants after the auction which included an amount paid to [an employee] as a kickback." *Id*.

This court is persuaded by the reasoning in *Overland Bond*, and rejects Defendants' first argument. It would make little sense to allow Defendants to rely on the general maxim that sellers are free to quote whatever price they desire, in the specific circumstances alleged here, namely a bribery-kickback scheme between a seller and a buyer's employee. To rule otherwise would essentially lead to the holding that an invoice, intentionally inflated by a seller to pay a bribe to the buyer's employee, does not contain a misrepresentation. Instead this court finds, at this stage of the litigation, that Al Maha has satisfied the false statement requirement of fraudulent misrepresentation, by alleging that the pro formas contained, but did not disclose, an inflated price fixed as a result of an undisclosed side agreement between Defendants and Gale. *See supra* at 3-5.

This court also rejects Defendants' second argument that Al Maha has "severely mischaracterized" the emails and various other documents Al Maha cites in support of its fraudulent misrepresentation claim. At this point in the litigation, the court must accept Al Maha's allegations as true and not consider any characterizations to the contrary. All of the following are reasonable interpretations of the exhibits relating to this claim.

On May 20, 2008, Gale sent an email to Paul and Peter Darley stating, "Here is the pricing list that we would like to have indicated on the pro-forma quotations per the commission fee." (Pl's Resp., Ex. 8.) The pricing list Gale requested listed new, *higher* price quotes to Al Maha for the fire trucks and equipment. (*Id.*) In response, Peter Darley provided Gale new invoices, adopted Gale's requested higher prices, and even highlighted the lower original quote in a side-by-side comparison. (Pl's Resp., Ex. 8-10.)

On November 5, 2008, after Al Maha made payment on one of the fire trucks, Gale sent an email to Peter Darley, requesting "the first wire transfer of $75,000 against the fire truck

in Dubai." (Pl's Resp., Ex. 12.) Gale gave wiring instructions to a personal bank account in Bahrain, Peter Darley immediately authorized payment to Gale's account, and Darley wired payment that same day. (Pl's Resp., Exs. 12-13.)

In late November, Peter Darley suspected that Gale's immediate supervisor, Al Enizi, was causing payments to Darley to slow down. (Pl's Resp., Ex. 14.) And, on November 20, 2008, Peter Darley emailed Gale, asking that he "provide [Peter Darley] with a united direction for commission payments". (*Id.*) In a January 5, 2009 email to Peter Darley, Gale indicated that he and Al Enizi had agreed to split the payment 50/50. (Pl's Resp., Ex. 15.)

After Peter Darley asked Gale for wiring information, (Pl's Resp. Ex. 18), Gale promptly emailed him with wiring instructions for Gale and Al Enizi's bank accounts in Bahrain. (*Id.*) On March 6, 2009, Peter Darley sent an email to Darley's CFO authorizing wire transfers to Gale and Al Enizi's bank accounts in Bahrain for $166,873 each. (*Id.*)

Defendants' only response to this probative evidence is to offer the court an implausible, benign interpretation of these documents, arguing that the emails merely indicate that Darley agreed to pay a "commission", not a bribe. (Def's Mot. at 11-12.) However, when deciding a Rule 12(b)(6) motion, this court is required to construe the complaint in a light most favorable to plaintiff and draw all reasonable inferences on plaintiff's behalf. *Cole*, 634 F.3d at 903.

The above documents appear to demonstrate that Al Maha's fraudulent misrepresentation claim is plausible when the inferences therefrom are drawn in Al Maha's favor. The documents show Gale asking Darley to raise prices at the same time as he requested a "commission", Darley providing Gale with revised invoices containing a higher prices, and Darley making payments to Gale and his supervisor's personal bank accounts in Bahrain. It would be contrary to the above standard for this court, confronted with such facts at the motion to dismiss stage, to ignore the

inference that Defendants inflated their invoices, misrepresented their pricing to Al Maha, and in turn bribed Gale for his purchasing influence at Al Maha. The court declines to find, at this stage in the litigation, in favor of the inference that Darley, a seller, agreed to make a commission payment to Al Maha, its customer, which was routed through two employees' personal bank accounts in Bahrain.[1]

### b. Fraudulent Omission

A claim for fraudulent omission requires the alleging of "meeting the elements of fraudulent misrepresentation" and additionally alleging "that the defendant intentionally omitted or concealed a material fact that it was under a duty to disclose to the plaintiff". *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012).

In Al Maha's Motion to Dismiss Response (Dkt. No. 91), Al Maha summarizes its fraudulent omission claim as follows. "Darley intentionally omitted and concealed material facts in its May 21, 2008 pro formas", "[s]pecifically, Darley . . . omitted the material facts that the purported price quotes included hidden purported third party payments to Gale, Al Maha's employee, if Al Maha purchased the goods from Darley." (*Id.* at 19.)

Defendants set out two major arguments against Al Maha's fraudulent omission claim. First, Defendants argue that they had no duty to disclose the component prices of the price Darley quoted Al Maha, including the commission payment. (Def's Mot. at 12-13.) Additionally, in Reply (Dkt. No. 97), Defendants argue that Al Maha has not alleged that Gale concealed his commission from Al Maha. (*Id.* at 7.)

---

[1] In Reply (Dkt. No. 97), Defendants offer the additional argument that Al Maha's fraudulent misrepresentation claim should be dismissed, because Darley "plainly disclosed the commission payment to Al Maha." (*Id.* at 8-9.) This argument rests on documents merely showing that Darley disclosed the commission to Gale—*i.e.*, the person Darley was allegedly bribing by inflating the invoices.

Arguments as Defendants first argument have previously been rejected in this district. In *In re: Salem Mills, Inc. v. Wisconsin Tool and Stamping Co.*, 881 F.Supp. 1109 (N.D. Ill. 1995) (Castillo, J.), corporate officers of a seller, who made an undisclosed payment to the buyer's employee in connection with a purchase, were liable for fraudulent omission. *Id*. at 1114. In this well-reasoned opinion, now Chief Judge Castillo held that the officers' "failure to disclose the fact that they had agreed to make and in fact made payments to [buyer's employee] constitutes a false statement of material fact," because "[s]ilence, accompanied by an act of concealment or the suppression of material facts, constitutes a false statement." *Id*.

Similarly here, Individual Defendants Paul and Peter Darley received an email from Gale asking Darley to raise prices at the same time that Gale requested a "commission." The Individual Defendants then provided Gale with revised invoices containing higher prices without explicitly breaking out the "commission" for Al Maha's benefit. Darley finally made payments to Gale and his supervisor's personal bank accounts in Bahrain. Frankly, this conduct supports the inference of fraud.

The court at this juncture is not required to reach the ultimate question of fact. When deciding a Rule 12(b)(6) motion, this court is bound to construe the complaint in a light most favorable to plaintiff and draw all reasonable inferences on plaintiff's behalf. *Cole*, 634 F.3d at 903. The court consequently refuses to find, as Defendants would have us do, that Defendants were making and approving payments to Gale's Bahrain bank account, all the while assuming Gale had disclosed his "commission" to Al Maha.

The court holds that Al Maha's fraudulent omission claim is sufficiently alleged to proceed, because Al Maha is entitled to the inference that Gale sought a payment for himself, which he did not disclose to Al Maha, and the Defendants understood and consented to this

course of conduct.  The fact that Gale's proposed price list did not separately break out this

commission supports the inference that Gale's payment would not be disclosed to Al Maha.  The

Individual Defendants' failure, despite their business experience, to question Gale on whether Al

Maha authorized the payment further supports this inference.

       *c.*     *Civil Conspiracy*

According to the Illinois Supreme Court, the elements of civil conspiracy under Illinois

law are (1) a combination of two or more persons, (2) for the purpose of accomplishing either an

unlawful purpose or a lawful purpose by unlawful means in a concerted action, and (3) in

furtherance of which one of the conspirators committed an overt tortious or unlawful act.  *Fritz v.*

*Johnston*, 807 N.E.2d 461, 470 (Ill. 2004).

Al Maha alleges that Darley conspired with Gale to accomplish by concerted action the

lawful act of selling fire trucks and equipment to Al Maha by unlawful means, namely, bribery

and fraud.  (Pl's Resp. at 22.)  Additionally, Al Maha has alleged that Paul Darley and Peter

Darley participated in Darley's unlawful means of bribery and fraud.  (*Id.*)

In response, Defendants set forth several arguments why Al Maha's conspiracy claim

must fail as a matter of law.  First, Defendants argue that Al Maha's has not alleged an

independent cause of action underlying its conspiracy claim.  (Def's Mot. at 14.)  Next,

Defendants argue that Al Maha cannot allege a civil conspiracy against the Individual

Defendants under the intra-corporate conspiracy doctrine, because a corporation and its directors

are legally incapable of conspiring with each other.  (*Id.*)  Finally, Defendants argue that it is

legally impossible for the Individual Defendants to be liable as co-conspirators, because a

corporation can only act through the conduct of its agents.  (*Id.* at 16.)

As previously discussed, Defendants are incorrect that Al Maha has not alleged an independent cause of action underlying its conspiracy claim. This court has already found that Al Maha has alleged both fraudulent misrepresentation and omission. *Supra* at §§ I.a, I.b. Additionally, this court is persuaded that Al Maha's bribery allegations, whether based on Illinois' criminal bribery statute or the common law, sufficiently plead unlawful acts capable of underlying the conspiracy claim. *See Fritz*, 807 N.E.2d at 470-71 (holding allegation of filing false police report in violation of Illinois criminal statute "satisfies the third element [of civil conspiracy], the actual commission of an overt unlawful act by one of the conspirators."); *see also Williams Elec. Games, Inc. v. Garrity*, 366 F.3d 569, 576-77 (7th Cir. 2004) (recognizing a common law claim for commercial bribery as an intentional tort).

The court also disagrees with Defendants' theory that Individual Defendants cannot be liable for civil conspiracy due to the intra-corporate conspiracy doctrine. Simply put, Al Maha has not alleged that Individual Defendants were conspiring with Darley, rather Al Maha alleges that they were conspiring with Gale as a third-party.

The court, additionally, rejects Defendants' contention that Individual Defendants cannot be held liable, because a corporation can only act through the conduct of its agents. In *North Shore Medical Center, Ltd. v. Evanston Hospital Corp.*, No. 92-6533, 1996 WL 435192, at *3 (N.D. Ill. July 31, 1996) (Grady, J.), the court held that although corporate officers cannot be liable *as co-conspirators* in a conspiracy between the corporation and a third-party, based on agency principles, corporate officers are liable *as participants* in a corporation's tortious conduct of entering the conspiracy with a third-party to defraud a plaintiff. The court reasoned, to hold otherwise, would not be "consistent with the well-established rule that corporate officers are liable for any torts of the corporation in which they have participated." *Id*. Here, just as in *North*

*Shore*, Individual Defendants are not potentially liable as co-conspirators, but rather as participants in Darley's tortious conduct of entering in a bribery-fraud conspiracy with Gale.

        *d.*       *Paul Darley's Potential Liability*

Under Illinois law, a corporate officer is liable for a corporation's torts if they "participated in the conduct giving rise to that liability." *Itofca, Inc. v. Hellhake*, 8 F.3d 1202, 1204 (7th Cir. 1993). As discussed above, Al Maha brings all the claims at issue, including Count I, against both Darley and Paul and Peter Darley.

Defendants argue that Counts I through III should be dismissed against Paul Darley. (Def's Mot. at 20-22.) Defendants contend that mere knowledge, or passive acquiescence, to a corporation's alleged wrongdoing is not enough to hold a corporate director liable. (*Id.*) Rather, Al Maha must show active involvement on the part of Paul Darley, a showing Defendants contend Al Maha has failed to do. (*Id.*)

Because Al Maha has sufficiently alleged that Paul Darley was actively involved in the bribery-kickback scheme at the heart of Counts I through III, Defendants' motion to dismiss cannot be granted on that point. As discussed above, from February 26, 2008 to late May 2008, Paul Darley directly sent or received ten emails to or from Gale relating to Al Maha's potential purchase of fire trucks and equipment. (Pl's Resp., Exs. 3-4, 8.) Such correspondence supports the inference that Paul Darley was far from a passive participant in Darley's interactions with Gale, but rather Darley's point person for its dealings with Gale.

This active involvement on Paul Darley's part continued in the series of emails at the heart of this matter. On May 1, 2008, Peter Darley emailed Gale, copied Paul Darley, and attached Darley's initial pro forma price quotes to Al Maha for fire trucks and equipment. (Am. Compl. ¶ 25; Pl's Resp. Exs. 5-6.) On May 20, 2008, Gale sent his request for higher price

quotes and payment to both Paul and Peter Darley, specifically addressing his email to "Paul". (Am. Compl. ¶ 29; Pl's Resp. Ex. 8.)  When Peter Darley emailed Gale to agree to his demands, Peter Darley copied Paul Darley.  (Am. Compl. ¶ 30; Pl's Resp. Exs. 8-10.)

The court agrees with Al Maha that, given the above correspondence, it is highly unlikely that Paul Darley simply was ignored these emails, especially when Gale addressed some of them to Paul Darley.  Not only do the emails portray Paul Darley acting as Darley's point person for its dealings with Gale, but the emails also depict Paul Darley being informed of every important step in hatching the alleged bribery-kickback scheme.

Al Maha is entitled to the plausible inference at the motion to dismiss stage, that Peter Darley, as Executive Vice President and Chief Operating Officer, would have discussed Gale's request with Paul Darley, as Chief Executive Officer.  Additionally, Al Maha is also entitled to the plausible inference that Peter Darley sought Paul Darley's consent to engage in the alleged bribery-kickback scheme, as opposed to acting unilaterally.

## 2.    Violation of the Illinois Consumer Fraud Act (Count II)

Al Maha alleges in Count II of its Amended Complaint (Dkt. No. 51) that "[t]he fraudulent acts of each of the Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS 505/1 *et seq.*, because the fraud occurred in the course of conduct involving trade or commerce."  (Am. Compl. ¶ 63.)

Determining whether a nonresident plaintiff, such as Al Maha may bring an Illinois Consumer Fraud Act ("ICFA") claim is a fact specific inquiry.  *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009).  The courts consider a number of factors including: (1) the claimant's residence; (2) the defendant's place of business; (3) the location of the relevant item that was the subject of the disputed transaction; (4) the location of the claimant's contacts with

the defendant; (5) where the contracts at issue were executed; (6) the contracts choice-of-law provisions; (7) where the alleged deceptive statements were made; (8) where payments for services were to be sent; and (9) where complaints were to be directed. *Haught v. Motorola Mobility, Inc.*, No. 12-2515, 2012 WL 3643831, at *3 (N.D. Ill. Aug. 23, 2012) (Kendall, J.)

Defendants argue primarily that Al Maha may not bring a ICFA claim against them, because the disputed transaction did not occur primarily and substantially in Illinois. (Def's Mot. at 17-18.) Additionally, Defendants argue that Al Maha has failed to allege a deceptive or unfair practice as the ICFA requires. (*Id*.)

This court finds that Al Maha has alleged enough facts to support an ICFA claim. Though Al Maha is a resident of Saudi Arabia, Defendant's place of business is in Illinois. (Am. Compl. ¶ 1.) Al Maha's contacts with Darley, through Gale, were made in Illinois. (*See* Pl's Resp., Exs. 3-6, 8-10.) Darley's allegedly deceptive pro formas were prepared in and issued from Illinois. (*See* Pl's Resp., Exs. 8-10.) Defendants' payments to Gale and Al Enizi were sent from Darley's bank in Illinois. (*See* Pl's Resp., Exs. 13, 19.) Al Maha's payments for the fire trucks and equipment were also sent to Darley in Illinois. (*See* Pl's Resp., Ex. 11.)

As discussed in Part I above, Al Maha has alleged that Defendants engaged in a deceptive bribery-kickback scheme, whereby Defendants created fraudulent, inflated invoices for Al Maha and concealed their fraud, to bribe Gale for his purchasing influence.[2]

---

[2] Defendants are correct that Al Maha may not support its ICFA claim with allegations this court would have disallowed in its prior order had they not been raised in reply. Al Maha has not adequately alleged Defendants violated the ICFA by Defendants' failure to disclose that the fire trucks would not be operable in Saudi Arabia and had excessive mileage. (Pl's Resp. at 24-25.) As this court previously noted "[c]ommon sense suggests that it would be absurd for Darley to intentionally sell Al Maha fire trucks that it knew were inoperable in Saudi Arabia." (Dkt. No. 27, Mar. 27, 2013 Order, at 25.) The court finds the additional evidence Al Maha directs this court to unpersuasive. (Pl's Resp. at 24-25 & n.9, 10.)

### 3. Inducement of Fiduciary Breach (Count III)

Under Illinois law, tortious inducement of breach of fiduciary duty requires a plaintiff to prove that: (1) the defendant colluded with a fiduciary in committing a breach; (2) the defendant knowingly colluded in or induced the breach; and (3) the defendant knowingly accepted the benefits from that breach. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 508-09 (7th Cir. 2007).

Al Maha alleges that Gale breached his fiduciary duties by accepting bribes from Darley, "steer[ing] contracts for the purchase of fire trucks and equipment to Darley, [] not seeking competitive bids, [] conspiring with Defendants to increase Al Maha's cost of the contracts by the amounts of the bribes". (Am. Compl. ¶ 66.) In turn, Al Maha alleges that the Defendants "induced [these] breaches by Gale." (*Id*. ¶ 67.)

Defendants argue that Count III should be dismissed on two bases. First, according to Defendants, Al Maha has failed to sufficiently plead that Defendants agreed to pay a "bribe-kickback" to Gale, inflated invoices to Al Maha, and concealed this arrangement. (Def's Mot. at 19-20.) Again, as discussed above in Section I, this court finds all of these allegations sufficiently pled. Second, Defendants claim that they could not have induced Gale's breach, because, as Al Maha admits, Gale solicited the alleged bribe. (*Id*.) Under Illinois law, Defendants inducement of fiduciary breach does not require that a defendant initially purpose the breach. *Borsellino*, 477 F.3d at 508-09. Instead, it is enough for Al Maha to allege Defendants knowingly colluded in Gale's fiduciary breach.

### 4. Defendants' Rule 11 Motion

Defendants' Joint Rule 11 Motion for Sanctions (Dkt. No. 70) is premised on two arguments. According to Defendants, Al Maha and its counsel mischaracterized the May 2008

emails to plead their bribery-kickback scheme theory.  (*Id*. at 6-8.)  As discussed in Part I of this opinion, at the motion to dismiss stage, this court does not believe Al Maha has mischaracterized these emails.  Instead, the court finds the May 2008 emails plausibly support the inference that the bribery-kickback scheme Al Maha alleges occurred.

Defendants next seek Rule 11 sanctions based on their argument that Al Maha had no basis to assert Counts I through III against Paul Darley.  (*Id*. at 9-10.)  As discussed in Part I Section d of this opinion, not only was Paul Darley the Darley company's point person for interacting with Gale, but also he was completely informed as the bribery-kickback scheme was formulated.  In light of these facts, and others, the court refuses to extend to Defendants, at the current procedural posture, the inference that Paul Darley was a mere passive bystander in the alleged bribery-kickback scheme.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants' "Joint Rule 12(b)(6) Motion to Dismiss Counts I-III of Plaintiff's Amended Complaint" (Dkt. No. 73) is denied in its entirety.  Count I of the Amended Complaint (Dkt. No. 51.) plausibly alleges a bribery-kickback scheme among Gale and Defendants, and these allegations support Al Maha's claims for fraudulent misrepresentation and omission, and bribery conspiracy.  Count II states an Illinois Consumer Fraud Act claim, because Al Maha's allegations indicate that the bribery-kickback scheme occurred primarily and substantially in Illinois.  Count III alleges an inducement of fiduciary breach claim against Defendants, also based on the plausibly alleged bribery-kickback scheme.

Defendants' "Joint Rule 11 Motion for Sanctions" (Dkt. No. 70) is also denied for the reasons stated in this opinion.  Plaintiffs' motions for leave to file a surreply (Dkt. Nos. 98, 104) are granted.  The parties are strongly encouraged to discuss settlement and meet with Magistrate

Judge Finnegan on 6/4/14 at 8:00 a.m.  The case is set for a report on status before this court at 9:00 a.m. on 6/10/14.

                                        ENTER:

                                        *James F. Holderman*
                                        _____
                                        JAMES F. HOLDERMAN
                                        United States District Judge

Date:   June 2, 2014